UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:12-cr-128 |
| v. | ) | |
| | ) | Hon. Gerald Bruce Lee |
| CHRISTOPHER SYLVIA, | ) | |
| | ) | Sentencing Date: August 17, 2012 |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by undersigned counsel, hereby submits its position on the sentencing of the defendant, Christopher Sylvia. According to the Presentence Report, the defendant's Sentencing Guidelines range is 360 months to life imprisonment. For the reasons stated below, the government requests that this Court impose a sentence of 360 months' imprisonment.

## BACKGROUND

In November 2011, the Fairfax County Police Department and the FBI launched an investigation into the sex trafficking activities of the Underground Gangster Crips ("UGC"), a Fairfax County-based "set" affiliated with the Crips gang. Based on extensive victim and witness interviews, physical surveillance, electronic evidence, and the execution of multiple search warrants, law enforcement determined that UGC members and associates had engaged in the sex trafficking of at least eight juvenile females, ages 15 to 17, as well as adult females, from approximately 2006 through March 2012.

As explained in more detail in the Presentence Report, the evidence shows that UGC's recruitment efforts were multifaceted: UGC recruited juveniles and adults online through social

media websites such as Facebook, MySpace, and Datehookup; in person at Metro stations and bus stops; and in area high schools and a local juvenile detention center.  When encountering potential victims, the pitch was invariably the same:  Recruits were told that they looked pretty and were asked whether they wanted to make lots of easy money.  And once enticed into the enterprise, the execution of the scheme was methodical:  UGC members and associates groomed new recruits into commercial prostitution, beginning with a "demo" or "tryout" in which the victim engaged in sex with one or more members of the enterprise, after which an experienced female participant in the scheme (often referred to as the "Head Bitch in Charge" or "HBIC") would explain the gang's rules and procedures, even going so far as to allow the recruits to "watch and learn" as the HBIC or another female engaged in sex acts for money.  UGC members and associates then would purchase condoms at local pharmacies and convenience stores and drive the victims to area neighborhoods—including Chirilagua in Alexandria, Commerce Street in Springfield, and Ballston in Arlington.  Once there, the victims were instructed to walk through apartment complexes, going door-to-door to solicit customers while accompanied by a male bodyguard from the gang.  The going rate for victims' services typically was $30-$40 for 15 minutes of sex, and each victim often had sex with multiple men in one night (usually about 5-10 customers) and over the course of multiple weekdays or weekends (including as much as seven days a week).

Although the evidence suggests that many of the victims initially began prostituting voluntarily, it is also clear that methods of force, fraud, and coercion were pervasively used by the gang to recruit and maintain control over victims, both in overt and subtle ways.  Members of the enterprise, for example, concocted fake profiles on Facebook.com in female names such as "Rain Smith," "Mimi Jackson," and "Aaliyah Marie," using those profiles to send hundreds of

2

messages recruiting potential victims. Some victims were told that they would only be involved in dancing, stripping, or escorting, rather than sex, and the coconspirators further enhanced the bait-and-switch by sometimes providing only a fraction of the proceeds initially promised to victims. In addition, members invoked the gang to intimidate or coerce the victims into sexual activity, at times claiming that a "demo" with the members would serve as a form of "initiation" into the gang. The coconspirators also regularly plied the victims with alcohol and drugs, including cocaine, PCP, ecstasy, and marijuana, in order to reward the victims and keep them sedated or compliant. And when all of this failed, members did not hesitate to engage in force where necessary, choking one victim when she stated that she no longer wished to participate, allegedly assaulting and forcing another victim to engage in oral sex at knifepoint, beating and assaulting one victim who attempted to separate herself from the enterprise, and engaging in domestic violence in front of victims.

In March 2012, five UGC gang members and associates, including Sylvia, were charged with conspiracy to engage in sex trafficking of minors in violation of 18 U.S.C. § 1594, and each of the defendants subsequently pleaded guilty to one count of juvenile sex trafficking under § 1591(a)(1).[1] As part of his statement of facts, Sylvia has acknowledged participating in the sex trafficking of three victims in 2011 and 2012—J.T., M.W., and J.E., each of whom was 17 years old at the time of the offenses. During the course of that conduct, Sylvia drove the victims and others to the neighborhoods where the prostitution occurred and also served, according to many individuals, as "Strom's right hand man." PSR ¶ 12. Sylvia also walked with some of the

---

[1] Michael Jefferies (1:12-cr-143) was sentenced on July 6, 2012 before the Honorable Leonie M. Brinkema. Donyel Dove (1:12-cr-184) was sentenced on August 10, 2012 before the Honorable Anthony J. Trenga. Henock Ghile (1:12-cr-182) will be sentenced on September 7, 2012 before the Honorable Claude M. Hilton. Justin Strom (1:12-cr-159) will be sentenced on September 14, 2012 before the Honorable James C. Cacheris.

juvenile prostitutes as a bodyguard, and spoke with and solicited Spanish-speaking customers. According to one of the juvenile prostitutes, she observed Sylvia possess a firearm, under the driver's seat of his vehicle, during the prostitution activities. Sylvia also sometimes collected and distributed proceeds of the prostitution and received a portion of the proceeds himself.

Although the investigation focused on the activities that occurred between 2009 and 2012, victims and witnesses provided additional information regarding the early days of the enterprise. A.N., who was a 15-year-old runaway and prostitute in 2006, stated that Sylvia was also involved with the prostitution enterprise in its infancy. Consistent with information known about the enterprise from 2009 to 2012, A.N. identified Strom as the leader and the person who recruited her. A.N. also stated that Sylvia assisted Strom by walking with her and soliciting Spanish-speaking clients, by driving her to neighborhoods for prostitution, and by sharing in the enterprise's profits. During a pre-arrest interview in February 2012, Sylvia acknowledged that Strom and his associates had been engaged in a prostitution enterprise for five years.

As a result of his guilty plea, Sylvia faces a statutory maximum term of life imprisonment, and a mandatory minimum term of imprisonment of ten years. 18 U.S.C. § 1591(b)(2). Sylvia's Guidelines range is 360 months to life imprisonment.

## ARGUMENT

### I.    Applicable Sentencing Law

A sentencing court considers both the Sentencing Guidelines and other statutorily prescribed factors. *See* 18 U.S.C. § 3553(a); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). To determine a sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *Hughes*, 401 F.3d at 546. "Then, the court shall consider that range as well as other relevant factors set forth in the

guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.* at 546. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

Although the Sentencing Guidelines are advisory and are only one of the factors listed in § 3553(a), the Guidelines assist the court by "'provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities.'" *United States v. Booker*, 543 U.S. 200, 264 (2005) (quoting 28 U.S.C. § 991(b)(1)(B)); *see also* 18 U.S.C. § 3553(a)(6). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). The Guidelines, for example, encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an Offense Level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflecting "the history and characteristics of the defendant" (most notably by establishing a Criminal History Category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. 18 U.S.C. § 3553(a)(6); *see Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus,

although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

## II. Sentencing Guidelines Calculation

The United States concurs in the Probation Office's Guidelines calculation. The base offense level for sex trafficking of a juvenile older than 14 is 30. U.S.S.G. § 2G1.3(a)(2). The offense level is increased by two levels because the conduct involved the use of a computer to solicit prostitution with a minor. *Id.* § 2G1.3(b)(3)(B). The offense level is further increased by two levels because the commercial prostitution offenses involved the commission of a sex act, *id.* § 2G1.3(b)(4)(A); and by three levels based on the number of juvenile victims, *id.* § 3D1.4. After a three-level reduction for acceptance of responsibility, Sylvia is subject to a total Offense Level of 34.[2] Moreover, because Sylvia's conduct involved a pattern of activity involving prohibited sexual conduct, the offense level total is increased by five levels to 39. *Id.* § 4B1(b)(1). As detailed below, Sylvia is in Criminal History Category V, resulting in a Guidelines range of 360 months to life imprisonment.

## III. A Total Sentence of 360 Months Is Appropriate Based on the § 3553(a) Factors.

A sentence of 360 months' imprisonment is necessary and sufficient to account for the sentencing factors listed in 18 U.S.C. § 3553(a):

---

[2] The United States moves this Court pursuant to U.S.S.G. § 3E1.1 to grant a three-level reduction in the defendant's offense level for acceptance of responsibility. The defendant assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

**The Nature, Circumstances, and Seriousness of the Offense, and the Need for Just Punishment (§ 3553(a)(1), (a)(2)(A))**

Particularly important in this sentencing calculus is the nature and circumstances, as well as the seriousness, of the underlying offense, which involved the sex trafficking of juveniles for money through the use of force, fraud, and coercion.

The impact of this sex trafficking conspiracy on its juvenile victims likely will be profound and long-lasting. The enterprise arranged for its victims, young girls who were 15 to 17 years old, to have sex with multiple men, day after day, without regard to their physical and mental health. Such conduct is explained by the conspirators' view of these girls—namely, as commodities that could be used for their financial and sexual benefit.

The law properly recognizes that children are more vulnerable than adults. Children, even those who are 15 to 17 years old, are more easily manipulated and coerced based on their limited life experiences and still-developing judgment. For instance, one victim told investigators that she responded to Justin Strom's recruitment because she needed money, reasoning that she could use her earnings to buy nicer clothes so that she would be more popular in high school.

The conspirators seized on these traits to recruit and entice their victims, often through a combination of fraud and flattery. Many of the victims were recruited through false internet profiles, in which the conspirators posed as females, complimented the victim's good looks, and held out the promise of earning easy money. Some victims were assured that the job only involved dancing, stripping, or escorting, and not any sex acts, but once the victims met in person with the conspirators, they were quickly steered into prostitution. The juvenile victims, moreover, were required to take nude pictures and/or engage in a "demo," in which the victim

7

had sexual contact with multiple conspirators—practices that not only served to satisfy the sexual urges of the conspirators, but also to groom the girls for later commercial sex acts.

Juveniles also are more likely to remain in a dangerous and damaging situation such as this prostitution scheme. Once the girls started to work as prostitutes, the conspirators used coercion, threats, and in some cases, force, to retain control over their victims. The conspirators, for example, invoked their gang membership or association with UGC to obtain "initiation" sex or keep victims in line—conduct that many of the victims found particularly coercive. One victim, for example, stated that she was aware of the Crips street gang and believed her safety was in jeopardy if she refused to continue working. Other victims have described threats and physical assaults from members of the conspiracy, including one victim who was choked when she stated that she no longer wished to participate, another who allegedly was assaulted and forced to engage in oral sex at knifepoint, and another who enduring a beating when she attempted to separate herself from the enterprise.

In addition, the conspirators provided the girls with drugs and alcohol, both as payment for their work and to keep them compliant. At least one victim used cocaine for the first time when it was provided by a coconspirator, and another victim described how she was unable to escape the grips of the enterprise because her desire to stop prostituting was overwhelmed by her need to continue taking the drugs provided by her victimizers.

### History and Characteristics of the Defendant, Role in the Offense, and the Need for Incapacitation (§ 3553(a)(1), (a)(2)(C))

A total sentence of 360 months also properly reflects the history and characteristics of the defendant and his role in the offense, as well as satisfying the significant need to protect the public from any further criminal activity by Sylvia.

The roles played by each defendant in the prostitution scheme were relatively well-defined: Justin Strom was the leader and organizer of the operation, extensively involved in the online recruitment of victims, the grooming process, and overseeing the enterprise, while he nevertheless limited his public involvement in order to limit his risk of detection. Dove and Sylvia both drove and walked with the girls as bodyguards, and were involved in the enterprise as early as 2006. Henock Ghile served as a driver starting in spring 2011, while Michael Jefferies served as a driver and bodyguard for approximately two months in late 2011.[3] Several defendants engaged in "demos" of new recruits, and some conspirators allegedly carried guns while participating in the enterprise.

Although Sylvia was not the organizer or leader of this enterprise, he nevertheless was an integral part of the operation, sometimes driving the victims and coconspirators to their targeted neighborhoods and walking with the victims. Sylvia, moreover, facilitated the effective functioning of the enterprise by soliciting and negotiating with Spanish-speaking customers. Sylvia also sometimes collected and distributed proceeds of the prostitution and received a portion of the proceeds himself. In short, Sylvia was no passive bystander in the operation but instead was actively involved in the enterprise since its inception in 2006. *Compare* Def. Position with Respect to Sentencing at 4 (arguing that a minor role downward adjustment is warranted).[4]

---

[3] Ghile and Jefferies left the conspiracy on their own prior to their arrests.

[4] Section 3B1.2(b) provides an adjustment for a defendant who is substantially less culpable in committing the offense than the average participant. U.S.S.G. § 3B1.2, Application Note 3(A). "A defendant seeking a downward adjustment for his minor role in a criminal offense bears the burden of proving by a preponderance of the evidence that he is entitled to such adjustment." *United States v. Nelson*, 6 F.3d 1049, 1058 (4th Cir. 1993), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995). "The critical inquiry is thus not just whether the defendant has done fewer 'bad acts' than his codefendants, but whether the

Sylvia's involvement in the sex trafficking enterprise is especially troubling given his prior criminal history, including violence and threats of violence, multiple terms of jail with seemingly no effect, and repeated violations of court orders and probation supervision. As outlined in the Presentence Report, in 2011, Sylvia was convicted of threatening to kill the mother of his child by shooting her in the head.[5] In June 2011, a little over three months after he was sentenced for the threats described above, Sylvia committed an Unlawful Entry and Assault and Battery by Mob. A week after he committed that offense, Sylvia violated a protective order, issued after his violent threats. After serving a short jail sentence, Sylvia again violated the protective order four months later in October 2011. And, once again, Sylvia violated the protective order in February 2012. Sylvia also committed a portion of the instant offense while he was on active probation for two convictions, and inactive probation for a third offense. As a result of this criminal conduct, Sylvia has amassed ten total criminal history points, resulting in a Criminal History Category of V.

**Disparity, Deterrence, and Respect for the Law (§ 3553(a)(2)(A), (a)(2)(B), (a)(6))**

A total sentence of 360 months in prison, moreover, will promote respect for the law, deter the defendant and others from similar acts, and avoid unwarranted sentencing disparities.

---

defendant's conduct is material or essential to committing the offense." *United States v. Palinkas*, 938 F.2d 456, 460 (4th Cir. 1991), *vacated*, 503 U.S. 931 (1992), *reinstated*, *United States v. Kochekian*, 977 F.2d 905 (4th Cir. 1992). Sylvia's conduct, as described throughout this memorandum, shows that he was intimately involved in the conspiracy, played an integral part in its success, and contributed to its goals for a number of years. Sylvia's role thus cannot, in any respect, be described as "minimal."

[5] The sentencing memorandum submitted on the defendant's behalf suggests that the mother of Sylvia's child has sought protective orders "to punish the defendant for perceived slights by the defendant and his parents." Def. Position with Respect to Sentencing at 8. In addition to being irrelevant to these proceedings, this argument would also appear to be inconsistent with the April 11, 2012 letter submitted by Sylvia to this Court, in which Sylvia describes the mother of his child as "a great mother" and thanks "her and her family for loving and supporting me in my good efforts." Doc. 30-1, at 1 (Aug. 8, 2012).

Judges in this District have consistently imposed significant sentences for gang-related sex trafficking convictions under 18 U.S.C. § 1591.  In *United States v. Jose Ciro Juarez-Santamaria* (1:11-cr-217), the defendant was sentenced to <u>life imprisonment</u> (the Guideline sentence) for prostituting a 12-year-old girl and allowing his fellow MS-13 members to have sex with her for free.  In *United States v. Rances Amaya* (1:11-cr-556), the defendant was sentenced to <u>600 months</u> in prison (within the Guidelines range of 360 months to life imprisonment) for assisting another MS-13 member in running a juvenile prostitution business involving at least three juveniles by providing security and threatening the victims.  In *United States v. Alonso Bruno Cornejo Ormeno* (1:11-cr-260), the defendant was sentenced to <u>292 months</u> in prison (the low-end of the Guidelines range) for recruiting four juvenile prostitutes and managing all aspects of the prostitution ring.  In *United States v. Ramiro Espinoza Jamaica* (1:12-cr-91), the defendant was sentenced to <u>168 months</u> in prison (within the Guidelines range) for trafficking a 14-year-old girl on a single occasion.  And in *United States v. Alexander Rivas* (1:11-cr-166), this Court sentenced the defendant to <u>120 months</u> of imprisonment (below the low-end of the Guidelines range of 168 months) for recruiting two juvenile runaways to work as prostitutes.

Despite the significant sentences imposed in these recent cases, Sylvia seeks a sentence of 120 months—far below the Guidelines range—on the ground that one of his codefendants, Michael Jefferies, has received a sentence of 120 months in prison.  That comparison, however, is simply inapt.  Unlike Jefferies, who served as a bodyguard and driver in the operation for approximately <u>two months</u> beginning in November 2011 and voluntarily left the conspiracy, Sylvia's involvement (i) dates almost to the beginning of the scheme, with the trafficking of A.N., a 15-year-old girl, in 2006; (ii) continued even after he was incarcerated repeatedly; and (iii) was not interrupted by his own determination that his conduct was wrong, but rather, by his

11

arrest. Although the Presentence Report shows that Sylvia served multiple periods of intermittent incarceration from 2007 through the beginning of 2012, PSR ¶¶ 55-64, the evidence shows that when Sylvia was not incarcerated, he was involved in prostitution activities. In short, Sylvia was involved in this conduct far longer than the approximately two months during which Jefferies participated in the scheme.[6] Also, unlike Jefferies, who was in Criminal History Category III, Sylvia is in Criminal History Category V.

In contrast to the role played by Jefferies in the prostitution enterprise, Sylvia played a role that was more comparable to that of another codefendant, Donyel Dove. Like Dove, Sylvia was involved in the enterprise from its inception in 2006, and Sylvia likewise served as both a driver and bodyguard for the operation, sometimes walking with the girls, helping to solicit Spanish-speaking customers, and collecting and distributing proceeds of the prostitution. Although both Dove and Sylvia's participation in the UGC scheme was interrupted by various intermittent periods of incarceration, Dove spent a total of approximately three years in prison during this period, whereas Sylvia was jailed for a total of approximately eight months during the prostitution enterprise. Moreover, both Sylvia and Dove participated in the enterprise when they were not incarcerated, and neither individual voluntarily departed the scheme before their arrest.

As a result of his role in the prostitution enterprise, Dove was sentenced on August 10, 2012 to 276 months of imprisonment, consisting of 216 months for the sex trafficking offense and 60 consecutive months for using a firearm during a crime of violence unrelated to sex trafficking (along with 60 concurrent months for being a felon-in-possession of a firearm). Although Dove and Sylvia played roughly comparable roles in the enterprise, as noted above,

---

[6] Although the Court relied on multiple grounds for imposing this sentence, one of the relevant factors was Jefferies's relatively limited involvement in the enterprise in comparison to his codefendants.

12

Sylvia was involved in the scheme for approximately two years more than Dove because Sylvia served less time in jail (even taking into account the approximately five months during which Sylvia attended school in Norfolk, Virginia from August to December 2010). As such, the government submits that a sentence of 360 months for Sylvia would appropriately reflect his role in the sex trafficking offense and ensure that he is not sentenced to a term that would create disparity with Dove's sentence.

Finally, the recent increase in gang-related juvenile sex trafficking prosecutions in this District underscores the need for deterrence, both general and specific, of such conduct. Gang members and associates—as well as independent pimps who have no apparent connection to gangs or organized crime—have turned to sex trafficking because it is seen as a lucrative enterprise with low start-up costs, a readily replenished supply of victims, and significant demand in a marketplace that operates both online and on the street. Gang members and associates, whether in MS-13, the Crips, or other organizations, as well as other sex traffickers, must not be allowed to conclude that juvenile prostitution is a viable business enterprise, or that they will be punished lightly if caught. And the victims of such conduct—past, present, and future—should also be able to conclude that, once sex traffickers are apprehended, justice will be done.

## **CONCLUSION**

A substantial period of incarceration is fair, just, and necessary in this case. Accordingly, for the reasons stated above, the government requests that the Court impose a sentence of 360 months of imprisonment.

                                              Respectfully submitted,

                                              Neil H. MacBride
                                              United States Attorney

By:        /s/
                Marc J. Birnbaum
                Special Assistant United States Attorney (LT)
                Inayat Delawala
                Assistant United States Attorney
                Counsel for the United States
                United States Attorney's Office
                2100 Jamieson Avenue
                Alexandria, Virginia 22314
                (703) 299-3700 (phone)
                (703) 299-3982 (fax)
                marc.birnbaum@usdoj.gov
                inayat.delawala@usdoj.gov

Dated: August 10, 2012

CERTIFICATE OF SERVICE

I certify that on August 10, 2012, I electronically filed the foregoing memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW, Suite 300
Washington, D.C. 20006
valawyer@erols.com

By:     /s/
Inayat Delawala
Assistant United States Attorney
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700 (phone)
703-299-3982 (fax)
inayat.delawala@usdoj.gov